## Case No. 8,007.

### LAMAR v. The PENELOPE.[1]

District Court, E. D. South Carolina. Sept. 25, 1858.

SALVAGE—DISABLED FROM SICKNESS — COMPENSATION—MARINE INSURANCE—MASTER LEAVING VESSEL.

[1. A bark in charge of a common seaman, who did not understand navigation, and was sailing an unknown course, her master and first mate having died from yellow fever, with three of the remaining five seamen sick and the others in a feeble condition, with water in her hold, and part of her sails gone, flying signals of distress, fell in with a bark, whose master, turning his command over to the supercargo, took charge of the vessel, and navigated her to port, where he was compelled to stay in quarantine for several days. Held a salvage service, and $3,000 was a reasonable allowance, of which $970 should go to the master.]

[2. A master who leaves his own vessel in charge of the supercargo, a competent navigator, to take charge of a vessel in distress, her crew being sick with yellow fever, from which her master and mate died, leaving in charge a common seaman, who did not understand navigation, performs a salvage service necessary to save human lives, which would not forfeit the insurance on his own vessel; and he is entitled to generous compensation.]

[This was a libel in rem by C. A. L. Lamar, owner, and Eben T. Sears, master, of the bark Rawlins, against the bark Penelope, for salvage.]

MAGRATH, District Judge. This is a claim for salvage. The service was rendered to a vessel, whose captain was dead, and crew disabled from the prevalence of yellow fever, at a time when she was in charge of an ordinary seaman, who had no experience in navigation, and had been from necessity forced to occupy this position. At Matanzas the Penelope had taken in a cargo of molasses. There the captain and several of the crew had died. The command devolved upon the first mate. He was taken sick with the fever soon after he sailed, and died a short time before his vessel was boarded by the supercargo of the Rawlins, who came on board in consequence of the signal of distress hoisted by the Penelope. There can be no doubt of the disabled and distressed condition of the Penelope. She had several feet of water in the hold; all of her officers disabled or dying; and her crew, from sickness and exhaustion, unable to do their duty. With no one acquainted with navigation, unable to take an observation, mistaking the position in which she was lying by more than two hundred miles, the vessel, cargo, and crew were obviously in a precarious and helpless condition. That service which was rendered in such a case, and resulted in saving the vessel and cargo, is in all respects a salvage service. The condition of the vessel at the time she received assistance, as it regards herself and other matters, is necessary for our examination, because it is at the commencement of our enquiry as to the value of

---

[1] [Not previously reported.]

the service rendered. George Skinner, one of the crew of the Penelope, says that there was a great deal of water and molasses in the hold when she left Matanzas. She had not been pumped dry when she left. That for two or three days, from the sickness and exhaustion of the crew, they had not been able to pump the vessel. That by the mistakes of David Davis the vessel was about two hundred and fifty miles out of her way, and that he had been steering wrong from the time the master had been sick. After the death of the captain, no one on board could navigate the vessel, and the witness would not have trusted his life on board with those remaining. David Davis says, at the time when the Penelope was boarded she was very short handed; three were sick with fever; one died the next day; the rest of the crew very weak, having just recovered from sickness. It would have been impossible to navigate the Penelope without assistance from the Rawlins. If the crew, says the witness, had been well, there would have been no danger in going to Queenstown with Captain Sears of the Rawlins on board. In her then disabled condition she could go nowhere; the only thing to be accomplished was to save the lives on board, and the cargo and vessel. The witness says he had been sick the first day after he left Matanzas, and greatly exhausted from want of rest. He could not sleep because he was almost the only one on board not sick, or suffering from the effects of sickness. David Ward, also of the crew of the Penelope, says he united with David Davis in asking aid from the Rawlins. He thought the vessel in great danger. She was short of sails; had 21 or 22 inches of water in the hold. He heard Captain Williams say that their only chance of safety consisted in meeting some vessel. The Penelope was very short handed; had but five men left for duty. Charles McDonald, another of the crew of the Penelope, says that when boarded from the Rawlins, only four men were able to work. The Penelope, he says, was in a very dangerous condition, with the crew so disabled that with Captain Sears in charge of the Penelope she could not have been carried to Queenstown. For some days previous to the death of Captain Williams, the vessel, he says, was floating about, at the mercy of the wind and waves. These witnesses, to whose evidence I have referred, belonged to the Penelope, and composed part of her crew. They have, as has been seen, not only testified as to the condition of the vessel, but they describe that condition particularly. It is more to their description than to their conclusion that our attention should be directed.

Although the Penelope was rescued from no particular peril, actually impending, and which, but for the presence and aid afforded her, would reasonably be considered as involving her loss; yet it is by no means that merely speculative danger, which is not regarded as sufficient to entitle aid, when afforded, to be considered salvage. The condition of the Penelope was one of absolute unseaworthiness. The pestilence which hung over her in her voyage had so diminished the number and enfeebled the strength of her crew, and this had so affected the vessel in consequence of the unavoidable neglect which it had produced, that she was unseaworthy, and needed aid to ensure her safety. Nor is it sufficient that in her condition she might have escaped shipwreck and reached a port in safety, that the service rendered her is to be deemed not entitled to compensation. If she had not received succor and yet had reached a port in safety, it could be considered in no other light than a fortunate escape. A salvage service is not disregarded because without it the vessel may have escaped; but it is rewarded because by it a vessel exposed to danger was brought safely into port. But the nature and extent of the danger must be understood to enable me to determine the compensation. It is the first of the circumstances which are to be considered in estimating the value of the salvage service. She had water in her hold. She could be kept free with a competent crew, but she had it not. With a high wind, she would make water freely. How far this is to be considered a danger, or a circumstance which might grow into a danger, has not been made plain by the evidence. Even when she was in the possession of the salvors, she was navigated with the water in her hold; nor was any attempt made with the pumps to free her from it. This, then, I think, although it might have become a source of danger, had not yet become so, when the salvors took possession of her. She had lost a part of her sails, and to a certain extent this was a disadvantage; but she was worked into port with the sails she had, and may have with them performed a much longer voyage. The want also of her sails was in itself unseaworthiness, and if not in itself a cause of positive danger, was negatively so, inasmuch as by it she did not possess the capacity to enable her to escape. The disabled and enfeebled condition of her crew, the absence of any person qualified to command, either by former experience or a knowledge of navigation, was, however, the most serious and important of all the disadvantages to which the Penelope was exposed. Unitedly, they seem to me to have reduced her much below the required capacity of a vessel to contend with the elements, and therefore to have made that service by which she was rescued of much consideration.

Let us now turn to the salving vessel, to ascertain under what circumstances she afforded the required aid; for the compensation to which she is entitled is made up, among other things, of the risk encountered, or to which the vessel was exposed while rendering or in consequence of giving the necessary aid. Her condition immediately

subsequent to the time when she succored the Penelope shows that she was very far from being able to contribute to the relief of others without affecting her own safety. It is not, as has been urged in the argument, that the Penelope must be chargeable with all expenses or liable for all the consequences which befel the Rawlins; but if such expenses or consequences indicate an actual peril undertaken or braved by those who were on board of the Rawlins for the purpose of affording aid to the Penelope, having signals of distress hoisted, it is a circumstance, very properly to be considered in estimating the compensation. For a salvage service is compensated, not merely by a regard to the physical agencies which have been called into requisition, but in an equal degree to the moral qualities of humanity and courage which may have been excited and displayed. In this case a pestilence had seized the Penelope. Her captain survived only to order the signal which attracted succor. The first mate had died. The second officer, then in charge of the vessel, was wholly unqualified for the responsibility devolved upon him, and was also to some extent enfeebled. Of all the crew, but two, and they not able-bodied seamen, had escaped the fever. The Rawlins could not spare any part of her crew, but the captain, leaving his own vessel in charge of Mr. Postell, the supercargo, and who had sufficient knowledge of navigation to carry the Rawlins into Savannah, took charge of the Penelope. That he was free from the danger of being attacked with the disease does not appear. If he was, it should have been proved, as, in the absence of proof to the contrary, I will infer that in going on board the Penelope he incurred the risk of being one of the victims of the disease which had proved so terrible a scourge to her officers and crew. That in fact he was liable seems established by Mr. Postell. And in the same manner I must take into consideration the inconvenience and detention which, in addition to the risk of fever, he had to encounter after he reached the port of Charleston. The Penelope was infected; confined not only to the limits of quarantine regulations but considered as so well calculated to extend the disease that even within the quarantine limits she was watched, and no communication allowed with her or from her, except what was made by the physicians and the keeper of the guard boat. It was proved that for the first three days after the arrival of the Penelope, Captain Sears was not allowed to go even to the guard boat, and not until the eighth or ninth day was he allowed to visit the city. In estimating his share of the amount to be decreed for salvage it will be proper to bear in mind this inconvenience to which he was exposed.

The only matter in the case which has occasioned with me any difficulty is that I have hesitated in awarding compensation to a master who had left his own vessel. It is a practice not to be encouraged, and under ordinary circumstances I would probably feel bound to omit compensation altogether to a captain under such circumstances. It is therefore for me to state why I make in this case an exception. The salvage service which was rendered in this case was not calculated merely to save property; it was equally needed to ensure the safety of human life, and that consideration is enough to save for a salving vessel the benefit of her insurance, in a case of deviation which would be forfeited if the object of the deviation had been simply to rescue property. If I could regard the lives of those on board the Penelope as exposed to no pressing danger, I would refuse any participation in the salvage compensation to the captain who had abandoned his vessel. There must be a strong case presented to excuse that which is a gross violation of duty. I have said in this case that human life was at stake. If no tempest overtook that vessel, if she escaped stranding or shipwreck, sailing as she was without the aid of a navigator, almost literally without chart or compass, for the evidence establishes that, although they were on board, they were almost useless, yet the condition of the crew imperatively required that they should be brought into port. And if the conjecture of Postell be correct, and the crew, becoming disheartened, would attempt to abandon her, it is but reasonable to suppose that, enfeebled as they were, the effort must have cost the life of more than one. In addition to this, Mr. Postell, who was on board of the Rawlins as supercargo, was acquainted with the rules of navigation, and felt himself able to take the Rawlins into port. That the saving of the vessel and cargo involved, in their then condition, the saving of the lives of those on board; that the danger which threatened them was not only that of storm and shipwreck, but of helpless sickness at sea, and a mad attempt of all to abandon the ship, leading to the probable death of many; or the desertion by those who could escape of those who would have to remain,—all seem to me involved, not as the impending and imminent peril which hung over them, but the probable consequence of their position. Not because he saved property, then, but because in all probability he saved life, and in doing so, by leaving his own vessel sufficiently provided, have I come to the conclusion of admitting the right of the captain of the Rawlins to participate in this salvage compensation. And if he is entitled to participate it is proper that he should be well rewarded. His risk was great, according to the testimony of Mr. Postell. It involved the risk of his life. Mr. Postell, the supercargo, as such, is not entitled to participate. But in the absence of the captain of the Rawlins

he supplied his place, and this service would entitle him to share in the reward. Although not on board of the salved ship, he contributed materially to the salvage service, because by his undertaking the duties of the captain of the Rawlins that officer was enabled to go on board of the Penelope; and, if he had not done so, no other would have attempted it.

In estimating the value in money of this salvage, I am prevented from awarding as high an amount as I otherwise would, because, so far as the service consisted in preserving human life, that is not rewarded by a money compensation. 1 W. Rob. Adm. 329, 331. It is allowed to affect the compensation of saving property, but it is not regarded in itself as an act to be paid for in money. 1 Hagg. Adm. 84. And no one, at this day, will fail to acknowledge the wisdom of the British parliament in rejecting the rule as it formerly was, and as it is still in the United States, and in the place of it provide that this most meritorious service should be considered and compensated as salvage. 9 & 10 Vict. c. 99, § 19; Pritchard, Dig. 377, tit. "Salvage." Considering it, therefore, as connected with saving the vessel and cargo, I shall enter a decree for the sum of three thousand dollars. The distribution of this sum among the parties entitled will be made in the decree. The decree will provide that the respondent, by paying the said sum, with all costs, to the marshal, within ten days from this date, may be saved the sale of the vessel and cargo.

The following decree of distribution was subsequently entered:

The amount decreed to be paid in this case having been by the respondents paid in to the marshal, and by him, under an order of court, transferred to the registry, it is ordered, adjudged, and decreed that the sum in the registry, amounting to $2,970, be divided among the parties entitled to salvage in the following manner:

| | |
|---|---:|
| To the owners of the bark Rawlins.... | $1,000 |
| To Eben T. Sears..................... | 970 |
| To W. R. Postell..................... | 225 |
| To the 1st master.................... | 175 |
| To the six seamen, in equal shares, in all ............................... | 520 |
| To the steward and cook, each $40 in all | 80 |
| | $2,970 |